IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

HONSON LUMA
    *Plaintiff*,

    v.

DIB FUNDING, INC., *et al.*,
    *Defendants*.

Civil No. ELH-20-2504

## MEMORANDUM OPINION

The self-represented plaintiff, Honson Luma, filed a "Complaint And Appeal From Trademark Trial And Appeal Board." ECF 1 (the "Complaint"). He identified Dib Funding, Inc. ("Dib" or "DFI") and Sunshine Capital, Inc. ("Sunshine") as the "Defendant." *Id*. The Complaint arises from Dib's petition to cancel Luma's registration of the mark "DIBCOIN," on the ground that he is not the owner of the registered mark, as required by 15 U.S.C. § 1051(a).

Pursuant to 15 U.S.C. § 1071(b), Luma seeks reversal of the decision rendered on July 2, 2020, by the Trademark Trial and Appeal Board ("TTAB" or the "Board"), a component of the United States Patent Trademark Office ("USPTO"). *See Dib Funding, Inc. v. Luma* (the "TTAB Decision").[1] According to plaintiff, the TTAB improperly granted Dib "cancellation of Plaintiff's 'Dibcoin Mark (Reg. No. 5396033)," based on "weak documentation and testimony alleging that Plaintiff was not first to use the mark in commerce." ECF 1 at 1. Luma asserts: "Additional evidence was later obtained and submitted into the record, but it was deemed late and not considered." *Id*. In Luma's view, a review of the evidence makes plain that "Plaintiff was the first

---

[1] Plaintiff did not provide the Court with a copy of the TTAB decision. I have attached a copy of the TTAB decision as an Appendix to this Memorandum.

to use the Dibcoin Mark in commerce and is therefore the owner of the Dibcoin Mark." *Id.* Therefore, he asks the Court to vacate the TTAB Decision. *Id.* at 10-11.

## I.     Procedural Background

By Memorandum (ECF 11) and Order (ECF 12) of March 2, 2021, the Court granted plaintiff's request (ECF 10) for leave to serve defendants by publication.  On April 15, 2021, plaintiff docketed proof of service reflecting that "Defendant" was served on April 4, 2021, by publication of a summons and copy of the Complaint in a newspaper with circulation in defendants' locality, and by registered mail.  ECF 13, ECF 13-1; ECF 13-2; ECF 13-3.[2]  If service was accomplished, then, pursuant to Fed. R. Civ. P. 12(a)(1)(A), defendants' answer was due by April 26, 2021.

The Court received a letter from Adam Petty on April 26, 2021.  ECF 14.  He identified himself as the "CEO and majority owner of DIB Funding, Inc."  *Id.*  Further, he advised that "a business associate" informed him of this suit on April 22, 2021, and he "then discovered" that Dib's response was due on April 26, 2021.  *Id.*  Accordingly, Petty asked the Court for "additional time to secure legal representation and for said legal representation to have time to review the case."  *Id.*  By Order of April 27, 2021 (ECF 15), I granted defendants until May 28, 2021, to secure counsel.

Petty sent a fax to Chambers on May 28, 2021 (docketed June 2, 2021), in which he indicated that he was in the process of selecting an attorney, but that he required "more time to secure" counsel.  ECF 19.  In an Order of June 2, 2021, I granted another extension—this time

---

[2] Plaintiff's submission is imprecise.  He states that the Order for Substitute Service "was mailed to Defendant on March 24, 2021."  But, there are two defendants; in referring to a single defendant, plaintiff fails to specify the party he means.  And, he states that the address of "the Defendants was unknown, and the Defendant could not be located."  ECF 13 at 1.  The exhibits do not shed light on the confusion.

until June 25, 2021.  ECF 20.  However, no lawyer entered an appearance for either defendant by that date.

Thereafter, on June 29, 2021, plaintiff moved for Clerk's Entry of Default for want of answer or other defense.  ECF 21.  The following day, the Clerk entered default against defendants (ECF 22) and provided notice of the same.  ECF 23.

Then, on June 30, 2021, via fax (docketed July 1, 2021), Petty filed a motion "To Intervene As Of Right Or, In The Alternative, Permissively As Co-Defendant."  ECF 24 (the "Intervention Motion").  He identified himself as "a resident of Michigan," as well as "President, CEO and majority stockholder" of DFI.  *Id.* at 2.  Petty also claimed that he holds a lien on all assets of DFI, including the trademark DIBCOIN.  *Id.* at 3.  Plaintiff opposes the Intervention Motion.  ECF 30.

In addition, Petty filed "Defendant's [sic] Motion To Dismiss For Lack Of Personal Jurisdiction, Or Alternatively, Motion to Transfer Venue To The Western District of Michigan" (the "Motion to Dismiss").  ECF 25.  In the Motion to Dismiss, Petty identified himself as the defendant.  *Id.* at 1.  He also stated that Sunshine was domiciled in Nevada, but is now "defunct," and asserted that Dib owns a majority of Sunshine.  *Id.*  Further, he claimed that Dib is a Michigan corporation.  *Id.*  And, he stated that Petty resides in Michigan, while Luma is a resident of Maryland.  *Id*.  As an alternative to dismissal, Petty seeks transfer of the case to the Western District of Michigan.  ECF 25 at 5.  Plaintiff opposes the Motion to Dismiss.  ECF 28.

Notably, Petty is not a named defendant in this suit.  And, as discussed, *infra*, he cannot appear on behalf of a corporation.  *See Rowland v. Calif. Men's Colony*, 506 U.S. 194, 201-02 (1993) ("It has been the law for the better part of two centuries . . . that a corporation may appear in the federal courts only through licensed counsel."); *see also* Local Rule 101.1(a) ("All parties other than individuals must be represented by counsel").

3

Plaintiff subsequently filed a "Request For Clerk's Entry Of Default Judgment [sic] Against Sunshine Capital Inc. And Dib Funding Inc." ECF 27 (the "Default Judgment Motion"). The Default Judgment Motion is supported by six exhibits, docketed at ECF 27-1 through ECF 27-6. Petty responded with a "Motion to Deny Default Judgement [sic] Against Defendants and Motion for Summary Judgement [sic] Against Plaintiff" (ECF 31, the "S.J. Motion"). It is supported by several exhibits. Plaintiff opposes the S.J. Motion. ECF 34.

Petty also filed a "Request to Abate Default Motion" (ECF 32, the "Abatement Motion"). And, Luma filed a response in opposition. ECF 33.

No hearing is necessary to resolve these motions. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Intervention Motion (ECF 24). I shall also deny the Motion to Dismiss (ECF 25); the Default Judgment Motion (ECF 27); the S.J. Motion (ECF 31); and the Abatement Motion (ECF 32), without prejudice.

## II. Factual Background

The resolution of the pending motions does not turn on the specific allegations underlying the instant dispute. However, to contextualize the issues, it is helpful to provide a brief factual backdrop.[3]

According to the Complaint, Luma "is an individual who resides and conducts business relative to the cryptocurrency Dibcoin in the State of Maryland and particularly in the city of

---

[3] The Court may take judicial notice of "'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015); *see* Fed. R. Evid. 201(b). Therefore, for the purpose of this Memorandum, I have drawn on facts as described in the TTAB Decision. *See Schultz v. Braga*, 290 F. Supp. 2d 637, 651 n. 8 (D. Md. 2003) (taking judicial notice of dockets in state proceedings). However, if the Court is tasked with reaching the merits, it may not defer to the Board's factual findings. *See Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 155-56 (4th Cir. 2014) (outlining district court's standard of review of TTAB decision).

Baltimore, Maryland." ECF 1, ⁋ 1.  He asserts that he was the "owner . . . on the Principal Register of the mark DIBCOIN . . . ."  TTAB Decision at 1 (emphasis omitted).

Dib was "formed in 2015 for the purpose of 'acquiring third-party companies through the use of crypto-currency.'"[ ]  *Id.* at 6 (citation omitted).[4]  And, Sunshine was a "majority-owned, publicly-traded company of [Dib]," but "is now defunct."[ ]  *Id.*  (citation omitted).  Petty is identified as the CEO of both corporations.  *Id.*

On July 28, 2016, Luma "contracted" with Sunshine to "provide 'general management services' . . . for a period of one year," in exchange for "one million shares of Sunshine Capital Stock."  ECF 1, ⁋⁋ 60-61, 63; *see* ECF 27-1 at 5-9 (the "Compensation Agreement").[5]  And, in August 2016, Luma was appointed Vice President of Dib and Sunshine.  TTAB Decision at 6.  However, Luma avers that defendants did not pay him the "shares of stock as agreed in the written contract."  ECF 1, ⁋ 79.

---

[4]  The Court may take "judicial notice of factual information found on the world wide web." *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007).  However, "these facts [must be] construed in the light most favorable" to the non-movant.  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by *Reed v. Town v. Gilbert*, 576 U.S. 155,165-67 (2015), as recognized in *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015).

Cryptocurrency is a "medium of exchange that is digital, encrypted and decentralized." Kate Ashford & John Schmidt, *What is Cryptocurrency?*, FORBES, https://www.forbes.com/advisor/investing/what-is-cryptocurrency/ (last updated Jan. 3, 2022). And, unlike conventional currencies, "there is no central authority that manages and maintains the value of cryptocurrency."  *Id.*  Further, ownership of cryptocurrency oftentimes "comes in the form of transactions that are verified and recorded on a blockchain."  *Id.*  A blockchain is a "distributed ledger enforced by a disparate network of  computers."  Jake Frakenfield, *Cryptocurrency*, INVESTOPEDIA, https://www.investopedia.com/terms/c/cryptocurrency.asp (last visited Jan. 2, 2021).

[5]  The Compensation Agreement indicated that Luma would be provided 333,333 shares of Sunshine Capital stock upon execution of the contract; 333,333 shares on July 28, 2017, and the remaining 333,334 shares "due on the 28th day of 2018."  ECF 27-1 at 6.

Cision PR Newswire issued a press release on September 16, 2016, announcing that Dib had created the cryptocurrency DIBCOIN, "'to be Used by Sunshine Capital, Inc. for Asset Acquisitions,'" and described DIBCOIN as "being a Sunshine product to 'purchase assets and other corporations without diluting the shareholders of Sunshine.'"[ ] TTAB Decision at 7 (citation omitted).  "[A] second press release was issued" on March 27, 2017, claiming that DIBCOIN "Ha[d] Been Approved To Trade On the Livecoin Exchange." *Id.* (internal quotation marks omitted).  However, approximately two weeks later, on April 12, 2017, "pursuant to an order from the U.S. Securities and Exchange Commission, Sunshine was suspended from trading in securities in the company."[ ] *Id.* (citation omitted).  "At some point in time, presumably after the suspension, Sunshine dissolved.[ ]" *Id.* (citation omitted).

On July 7, 2017, Luma resigned from his position with Dib and Sunshine. *Id.* at 8.  Thirteen days later, on July 20, 2017, Luma filed an application with the USPTO to register a trademark on DIBCOIN, claiming "that he first used the mark in connection with the identified services on July 5, 2016." *Id.*  The resulting registration was issued on February 6, 2018. *Id.* at 1 n.1.  Specifically, Luma claimed ownership of use of the DIBCOIN mark in the provision of the following services, *id.* at 2:

> Financial services, namely, providing a virtual currency for use by members of an on-line community via a global computer network; Financial services, namely providing electronic transfer of a virtual currency for use by members of an on-line community via a global computer network in International Class 36.

On an unspecified date, Dib filed a petition with the TTAB seeking cancellation of Luma's registration of the DIBCOIN mark, "on the ground that [Luma] was not the owner of the registered mark at the time of filing the underlying application," as required by federal law. *Id.*  In support of its petition, Dib argued that Luma "knew at the time he filed [the application that] his statement that he believes that the applicant is the owner of the trademark/service mark sought to be

registered was false."[ ]  TTAB Decision at 2 (alteration in TTAB Decision) (citation and internal quotation marks omitted).[6]

During a "trial period," the parties submitted various exhibits and declarations for the TTAB's consideration.  *Id.* at 3.  However, Dib "raised objections in its trial briefs to [Luma's] filing, on two different occasions, of two declarations and various other materials outside his assigned trial period."[ ]  *Id.* at 4 (citation omitted).  Further, according to the TTAB, Luma "made 11 different submissions with the Board well after his assigned trial period and subsequent to the filing of the parties' trial briefs."[ ]  *Id.* (citation omitted).

The Board issued its decision on July 2, 2020.  *Id.* at 1.  First, it declined to consider any materials that Luma submitted outside of his assigned trial period, on the ground that they were "manifestly untimely."  *Id.* at 5.  The TTAB explained: "Evidence not obtained and filed in compliance with the rules of practice governing inter parties proceedings before the Board will not be considered by the Board."  *Id.* (citing, *inter alia*, Rule 2.123(k); 37 C.F.R. § 2.123(k)).

As to the merits, the TTAB found that Dib had "demonstrated by a preponderance of the evidence that [Luma] was not the owner of the DIBCOIN mark on July 20, 2017, when [he] filed the use-based application that matured into the subject registration."  TTAB Decision at 12.  Further, it said that Luma's "efforts and involvement with the DIBCOIN cryptocurrency coin, and related technology and services associated therewith, were done at the behest and on behalf of [Dib] in his position as [Dib's] Vice President."  *Id.*  The Board also observed: "The evidence shows that the DIBCOIN cryptocurrency was first created and promoted at the time when [Luma] began working for [Dib]—in July 2016."  *Id.*  And, the TTAB pointed out that, under the

---

[6] Dib "also asserted likelihood of confusion and fraud as grounds for cancellation but did not pursue these grounds at trial or argue them in its trial brief."  *Id.* at 2 n.2  Therefore, the TTAB dismissed those claims as waived.  *Id.*

Compensation Agreement, it was "abundantly clear" that Luma had agreed to work "on behalf of Sunshine" and to "'use his best efforts to promote the interests of [Sunshine].'"[1]  TTAB Decision at 12 (alteration in TTAB Decision) (citation omitted).

Moreover, the Board determined that Dib had "demonstrated that it, and its related company Sunshine, were actually the entities using the mark throughout the relevant time period leading up to the filing of [Luma's] application." *Id.* at 16.  Further, it observed that plaintiff did not present any evidence to show that Dib or Sunshine "ever relinquished ownership or control of the mark to [Luma] or anyone else." *Id.*  Therefore, the TTAB concluded that Luma "was not the owner [of the Dibcoin mark] at the time of filing," and thus "the application that matured into [Luma's] registration was void ab initio." *Id.*  On this basis, the Board granted Dib's petition and cancelled Luma's registration of the DIBCOIN mark. *Id.*

Plaintiff timely appealed the TTAB's decision to this Court, pursuant to 15 U.S.C. § 1071(b).  *See* ECF 1.  This provision specifies, in part, that a "party to a cancellation proceeding . . . who is dissatisfied with the decision of the . . . [Board]," may pursue a "remedy by a civil action if commenced within such time after such decision, not less than sixty days . . . ." 15 U.S.C. §§ 1071(a), (b).  Further, it indicates that the presiding court "may adjudge that an applicant is entitled to a registration upon the application involved, that a registration involved should be canceled, or other such matter as the issues in the proceeding require, as the facts in the case may appear." *Id.* § 1071(b)(1).[7]

---

[7] As indicated, the parties do not reside in the same state.  *See* ECF 1, ¶¶ 1-2; ECF 15 at 1. Such circumstances implicate 15 U.S.C. § 1071(b)(4).  This provision specifies, in pertinent part: "Where . . . there are adverse parties residing in a plurality of districts not embraced within the same State . . . the United States District Court for the Eastern District of Virginia shall have jurisdiction . . . ."  Some courts have construed this provision as limiting jurisdiction over appeals to the single jurisdiction named in the statute.  *See*, *e.g.*, *Del-Viking Productions, Inc. v. Estate of*

Luma argues that the Board erred in refusing to consider the evidence submitted outside of his assigned trial period, because he did not discover the relevant evidence until "[l]ate into the proceedings." ECF 1, ¶ 6. In addition, plaintiff contends that these materials were not earlier available to him "due to viruses and malicious software implanted by a hack of the Plaintiff's computer, wherein emails and documents were stolen and or [sic] contaminated." *Id.*

And, Luma claims that this evidence makes amply clear that he was owner of the DIBCOIN mark at the time he submitted his application to the Board. In particular, plaintiff highlights that this evidence shows that on July 18, 2016, he sold 800,000 DIBCOIN, out of a total of 300 million, to the sole owner of Dib and Sunshine in exchange for 100,000 shares of Sunshine stock. *See id.* ¶¶ 10-11, 27-28; *see also* ECF 27-4. Further, plaintiff contends that the sale occurred prior to his

---

*Johnson*, Civ. A. No. 93-1831, 1994 WL 413752, at *1 (W.D. Pa. Feb.10, 1994); *Flying Tigers Oil Co. Inc. v. Flying Tigers Line, Inc.*, 118 F.R.D. 263 (D.D.C. 1988).

However, other courts have adopted a contrary view. Some have regarded the jurisdiction referenced in the statute as a "supplemental forum," *see Vosk Intern. Co. v. Zao Gruppa Predpriyatij Ost*, C11-1488RSL, 2012 WL 1033535, at *2 (W.D. Wash. Mar. 27, 2012), or the forum of "last resort . . . if they cannot otherwise join all necessary parties in another federal district court." *Shell Research Ltd. v. Matthewson*, Civ. A. No. 89-0160, 1990 WL 198646, at *1 (D.D.C. Nov. 21, 1990); *see also Pollo Campestre, SA de C.V. v. Campero, Inc.*, LOG-18-217, 2018 WL 10436602, at *2 (E.D. Va. Dec. 21, 2018).

In *Vosk*, the court observed that the statute "did not unambiguously" establish whether § 1071(b)(4) precluded review of a suit similar to plaintiff's. After an examination of the statute's legislative history, the court concluded that although "the statute speaks in terms of jurisdiction, it really refers to venue." *Id.* at *3. Further, the court found that the purpose of the provision was "not to limit venue, but to aid plaintiffs by providing a supplemental forum for plaintiffs who would otherwise be left without one . . . ." *Id.* at *4 (internal quotation marks omitted); *accord Bally Gaming, Inc. v. Kappos*, 789 F. Supp. 2d 41, 43-44 (D.D.C. 2011) (reaching the same conclusion as to an analogous venue provision found in 35 U.S.C. § 146); *Standard Oil Co. v. Montecatini Edison S.p.A.*, 342 F. Supp. 125, 131-33 (D. Del. 1972) (explaining that 35 U.S.C. § 146 "simply provided a supplemental forum . . . to a plaintiff in an interference suit when he could not otherwise obtain service of process upon all indispensable defendants in other fora under the general personal jurisdiction and venue statutes").

In view of the foregoing, I conclude that § 1071(b)(4) does not deprive the court of subject matter jurisdiction.

employment by defendants.  *See* ECF 1, ⁋⁋ 29, 30.  And, Luma alleges that, following DIBCOIN's suspension from the Livecoin exchange, he "continued to facilitate trading and other operations of the Dibcoin network despite Dib Funding [sic] desertion of the operation."  *Id.* ⁋ 87.

 In sum, Luma maintains that this evidence showed that, contrary to the TTAB's decision, he was the first to use the DIBCOIN mark in commerce and he is "the rightful owner of the Dibcoin Mark . . . ."  *Id.* ⁋ 91.  Consequently, he seeks an Order "vacating and setting aside the decision" of the TTAB.  *Id.* at 10.  Further, he asks the Court to adjudge "the Compensation Agreement of July 28, 2016 and [sic] void and non-binding"; find that "Plaintiff had a right to take corporate opportunities for himself";  and  determine "that Plaintiff owes no duty to Dib Funding, Inc., or any of its affiliates."  *Id*. at 10-11.

### III.  Intervention Motion

Petty has moved to intervene pursuant to Fed. R. Civ. P. 24.  ECF 24.  As stated, he is the "President, CEO, and majority stockholder" of Dib.  *Id.* at 2.  And, he asserts that DIBCOIN is the intellectual property of Dib.  *Id.* at 3.  Further, Petty indicates that he entered a loan agreement with Dib, by which he acquired "a lien on all the assets of DFI which include the trademark DIBCOIN."  *Id.*

In support of the Intervention Motion, Petty notes that he personally paid the legal fees to litigate the case before the TTAB, which took two and a half years.  *Id.*  He seems to imply that he cannot afford to retain corporate counsel.  *Id.*  He now seeks to intervene in his personal capacity to "protect the interests of DFI stakeholders as well as his own interest . . . ."  *Id.*

Motions to intervene are governed by Fed. R. Civ. P.  24.  It provides, in relevant part:

(a) Intervention of Right.  On timely motion, the court must permit anyone to intervene who:

(1) is given an unconditional right to intervene by a federal statute; or

(2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

(b) Permissive Intervention.

(1) *In General.*  On timely motion, the court may permit anyone to intervene who:
(A) is given a conditional right to intervene by a federal statute;  or

(B) has a claim or defense that shares with the main action a common question of law or fact.

\* \* \*

(2) *Delay or Prejudice.*  In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

Section 1071(b)(4) of 15 U.S.C. may also be relevant, although Petty does not cite it.  The provision states, in part, that "*any* party in interest *may* become a party to the action."  (Emphasis added).  Of import here, "a party in interest,"  for the purposes of trademark law, "does not have to demonstrate proprietary interests in the mark; it must only demonstrate a direct and personal stake in the outcome"  *Pro-Football, Inc. v. Blackhorse*, 62 F. Supp. 3d 498, 507 (E.D. Va. 2014) (citing *Jewelers Vigilance Comm., Inc. v. Ullenberg Corp., 823 F.2d 490, 493 (Fed. Cir. 1987) and *Ritchie v. Simpson*, 170 F.3d 1092, 1095 (Fed. Cir. 1999)); *see* U.S.C. § 1064 (outlining that a petitioner for cancellation of a trademark must demonstrate that it has a real interest in the outcome, and reasonably believes that the mark has caused or will cause damage).

In *Stuart v. Huff*, 706 F.3d 345 (4th Cir. 2013), the Fourth Circuit explained the standard for intervention of right under Rule 24(a)(2). It said, *id.* at 349-50 (quoting *Teague v. Bakker*, 931 F.2d 259, 260-61 (4th Cir. 1991)):

[A] district court must permit intervention as a matter of right if the movant can demonstrate "(1) an interest in the subject matter of the action; (2) that the

11

protection of this interest would be impaired because of the action; and (3) that the applicant's interest is not adequately represented by existing parties to the litigation."

In addition to the three factors articulated in *Stuart*, "timeliness is [also] a 'cardinal consideration' of whether to permit intervention . . . ." *Houston Gen. Ins. Co. v. Moore*, 193 F.3d 838, 839 (4th Cir. 1999) (citation omitted). When assessing the timeliness of a motion to intervene, the court "is obliged to assess three factors: first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the parties; and third, why the movant was tardy in filing its motion." *Alt v. U.S. EPA*, 758 F.3d 588, 591 (4th Cir. 2014). "The determination of timeliness is committed to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion." *Id.*

In order to intervene as of right, a movant's interest in the action must be "'significantly protectable'" and a movant must "stand to gain or lose by the direct legal operation." *Teague*, 931 F.2d at 261 (quoting *Donaldson v. United States*, 400 U.S. 517, 531 (1971)). With respect to the adequacy requirement of Rule 24(a)(2), "the Fourth Circuit has indicated that an intervenor's burden of showing inadequacy of representation is 'minimal.'" *First Penn-Pac. Life Ins. Co. v. William R. Evans, Chartered*, 200 F.R.D. 532, 536 (D. Md. 2001) (quoting *Commonwealth of Virginia v. Westinghouse Elec. Corp.,* 542 F.2d 214, 216 (4th Cir. 1976); alterations added). But, "[w]hen the party seeking intervention has the same ultimate objective as a party to the suit, a presumption arises that its interests are adequately represented, against which the [movant] must demonstrate adversity of interest, collusion, or nonfeasance." *Virginia v. Westinghouse Elec. Corp.*, 542 F.2d 214, 216 (4th Cir. 1976) (alteration added); *see also Stuart*, 706 F.3d at 350.

When the existing party has a legal obligation to represent the interests of the intervenor, then the intervenor has the "'onerous'" burden of making a "'*compelling showing* of inadequate

representation.'"  *See In re Richman,* 104 F.3d 654, 660 (4th Cir. 1997) (quoting *In re Thompson,* 965 F.2d 1136, 1142 (1st Cir. 1992)) (emphasis in *In re Thompson*).  Indeed, "courts now presume that the principal is adequately represented by its surety because they both have the 'same ultimate objective,' *i.e.,* to avoid liability on the payment bond." *Atl. Refinishing & Restoration, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 272 F.R.D. 26, 30 (D.D.C. 2010).

Even if Rule 24(a)(2) does not mandate intervention, a party may be entitled to permissive intervention under Rule 24(b).  *See Stuart*, 706 F.3d at 349.  The decision to grant or deny permissive intervention "'lies within the sound discretion of the trial court.'"  *Smith v. Pennington*, 352 F.3d 884, 892 (4th Cir. 2003) (quoting *Hill v. Western Elec. Co. Inc.*, 672 F.2d 381, 386 (4th Cir. 1982)); *see also McHenry v. C.I.R.*, 677 F.3d 214, 219 (4th Cir. 2012).

In *Shanghai Meihao Elec., Inc. v. Leviton Mfg. Co.*, 223 F.R.D. 386 (D. Md. 2004), then-District Judge Andre Davis distilled, from "the text of Rule 24(b) itself [and] case law interpreting the rule," four conditions with respect to permissive intervention.  They are as follows, *id.* at 387 (citations omitted; first alteration added, second alteration in *Shanghai Meihao Elec., Inc.*):

> (1) that [the intervenor's] motion is "timely"; (2) that its "claim or defense and the main action have a question of law or fact in common" . . . ; (3) that there exists an independent ground of subject matter jurisdiction; and, (4) that "intervention will [not] unduly delay or prejudice the adjudication of the rights of the original parties."

As indicated, Petty is "President, CEO, and a majority stockholder" of DFI.  ECF 24 at 2. He also claims that he acquired a lien on DFI's assets, including the DIBCOIN mark.  *Id.* at 3. Under § 1071(b)(4), "*any* party in interest may become a party to the action."  (Emphasis added). "Read naturally, the word 'any' has an expansive meaning . . . ."  *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008); *see United States v. Gonzales*, 520 U.S. 1, 5 (1997); *Alexander v. Carrington Mortg. Servs., LLC*, ___ F.4th ___, 2022 WL 164018, at *5 (4th Cir. Jan. 19, 2022).

Petty appears to have an interest in the subject matter of the suit. Apart from his claim that he acquired an important asset of DFI, the Clerk has entered default against DFI (*see* ECF 22), and Luma has since asked for a default judgment against the defendants, which, to date, is unopposed. *See* ECF 27.[8]

However, § 1071 (b)(4) also uses the word "may": "[A]ny party in interest *may* become a party to the action." (Emphasis added). The word "may" is consistent with a permissive right to become a party, but not a compulsory right.

The task of interpreting a statute begins with the text. *Murphy v. Smith*, ___U.S.___, 138 S. Ct. 784, 787 (2018) ("As always, we start with the specific statutory language in dispute."). To ascertain a statute's meaning, "'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Gundy v. United States*, ___U.S. __, 139 S. Ct. 2116, 2126 (2019) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007). Terms that are not defined are "'interpreted as taking their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted); *accord United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020).

It is well settled that "the word 'may' . . . implies discretion . . . ." *Kingdomware Technologies, Inc. v. United States*, 579 U.S. 162, 171-72 (2016). Thus, the statute's use of the word "may" indicates that a district court retains discretion in determining whether the intervention of a party in interest would be appropriate in a particular case.

The conclusion is bolstered by the construction of the provision as a whole. In 15 U.S.C. § 1071(b)(2), it states that the Director of the USPTO "*shall* have the right to intervene" in suits

---

[8] It goes without saying that the Court always benefits when it is able to hear the views of opposing sides.

brought under § 1071(b)(1) (emphasis added).  And, as the Supreme Court has explained, "the word 'shall' usually creates a mandate," indicating that "the district court has some nondiscretionary duty to perform." *Murphy*, 138 S. Ct. at 787 (citing *Lexecon Inc. v. Milberg Weiss Bershard Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion."); *see Maine Community Health Options v. United States*, ___U.S.___, 140 S. Ct..1308, 1320 (2020) ("The first sign that [a] statute imposed an obligation is its mandatory language: 'shall.'").

Congress's use of the words "may" and "shall" in "adjacent portions of the statute reinforces the conclusion that it knowingly selected" the word "may" in drafting § 1071(b)(4). *See South Carolina v. United States*, 907 F.3d 742, 756 (4th Cir. 2018).  Therefore, I am persuaded that § 1071(b)(4) provides one who is a "party in interest" with a permissive right of intervention, rather than an unconditional right, within the meaning of Fed. R. Civ. P. 24(a)(1).

Luma asks the Court to vacate an order of the TTAB, which canceled Luma's registration of the DIBCOIN mark.  ECF 1 at 10.  As noted, Petty is an officer of DFI as well as a majority stockholder of DFI (ECF 24 at 2), and he claims to have acquired a lien on DFI's assets, including the DIBCOIN mark.  *Id.* at 3. Thus, Petty allegedly has a "direct personal stake" in the subject matter of the suit, and would qualify as a party in interest within the meaning of 15 U.S.C § 1071(b)(4).  But, in the exercise of this Court's discretion, Petty has not offered the Court a persuasive reason to allow his intervention.

In my view, Petty's request is no more than a thinly veiled attempt to circumvent the well established principle that in federal court a corporation may not appear without counsel.  *See Rowland*, 506 U.S. at 201-02 (stating that "a corporation may appear in the federal courts only through licensed counsel"); *In re Tamojira, Inc.*, 20 F. App'x 133, 133-34 (4th Cir. 2001)

("Although 28 U.S.C. § 1654 permits parties to conduct their own litigation, it is well settled that a corporation that must be represented by an attorney in federal court."); *see also* 28 U.S.C. § 1654 ("In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."); Local Rule 101.1(a) ("All parties other than individuals must be represented by counsel"). Indeed, the Court previously informed Petty of this requirement in its Order of April 27, 2021. *See* ECF 15 (citing *Rowland*, 506 U.S. at 201, and Local Rule 101(a)).[9]

Although "an exception to this rule exists in cases in which a corporation fails to assert an available defense to an action against it . . . that exception is itself limited to cases in which the corporation's failure to defend is due to the negligence, bad faith, collusion, or fraud of the corporation's officers." *Jacobs* v. *Patent Enforcement Fund, Inc.,* 230 F.3d 565, 568-69 (2d Cir. 2000) (citing *Price v. Gurney*, 324 U.S. 100, 105 (1945)). Such circumstances are not present in this case.

Many courts have declined to countenance the exploitation of Rule 24 by corporate officers and shareholders. *See, e.g.*, *M2 Technology, Inc. v. M2 Software, Inc.*, 589 F. App'x 671, 675 (5th Cir. 2014) (per curiam) (explaining that a corporation's sole shareholder could not intervene in a trademark infringement suit on behalf of the corporation because doing so would "effectively nullify the well-established rule that in federal court, corporations must be represented by counsel"); *Motionless Keyboard Co. v. Microsoft Corp.*, 184 F. App'x 967, 968-69 (Fed. Cir. 2006) (per curiam) (describing the motion to intervene in a suit against the corporation by the

---

[9] As the Supreme Court explained, "the lower courts have uniformly held that 28 U.S.C. § 1654, providing that 'parties may plead and conduct their own cases personally or by counsel,' does not allow corporations, partnerships, or associations to appear in federal court otherwise than through a licensed attorney." *Rowland*, 506 U.S. at 202 (citations omitted).

corporation's controlling shareholder "as an attempted end run around section 1654"); *Jacobs,* 230 F.3d at 568-69 (finding that the corporation's president, sole officer and director could not intervene in a suit involving the corporation because the connection between the corporation and the officer was "so intimate" that the officer's intervention was "in effect an effort to enable [the corporation] to appear without counsel").

In *United States v. High Country Broadcasting Co.,* 3 F.3d 1244, 1245 (9th Cir. 1993) (per curiam), the Ninth Circuit expounded on the reasoning that undergirds these decisions. There, the president and sole shareholder of a corporation, who was not an attorney, attempted to represent the corporation in proceedings before a district court. *Id.* The court ordered the corporation to retain counsel, but the corporation failed to do so. *Id.* As a result, the district court entered a default judgment against it. *Id.* Thereafter, the president moved to intervene in the suit, which the district court denied. *Id.* On appeal, the Ninth Circuit affirmed the lower court's resolution of the case. *Id.* It explained, *id.*:

> In an ordinary case we might have our doubts whether [the corporation] could adequately represent [the president's] interests. But here [the president's] application to intervene pro se was nothing more than an end run around section 1654. As [the corporation]'s President, statutory agent and only shareholder, [the president] was singularly to blame for [the corporation's] failure to retain counsel. As an intervenor, [the president] sought . . . to represent [the corporation] pro se. To allow a sole shareholder with interests identical to the corporation's to intervene under such circumstances, rather than hire corporate counsel, would eviscerate section 1654. We decline to read Rule 24 as condoning such a result. *See* Fed. R. Civ. P. 1 (court shall interpret rules to "secure the just, speedy, and inexpensive determination of every action"); *Marquis Theatre Corp. v. Condado Mini Cinema,* 846 F.2d 86, 89 (1st Cir.1988) (Rule 1 prevents party from flouting spirit of rules, even if party fits within their literal meaning).

*HomeBingo Network, Inc. v. Cadillac Jack, Inc.*, 05-0701-WS-B, 2006 WL 3469515 (S.D. Ala. Nov. 20, 2006), is also instructive. There, the proposed intervenor purportedly had an interest in the subject matter of the suit separate from the relationship he shared with the plaintiff

corporation.  In that patent infringement action, the plaintiff corporation "transferred . . . its patent infringement rights and interests against the named defendants" to the corporation's founder and general manager, who then moved to intervene in the suit.  *Id.* at *1.  The court denied the motion, stating, in relevant part: "The obvious inference raised by this sequence of events is that [plaintiff] assigned its patent infringement rights to [the proposed intervenor] in order to circumvent the requirement that [plaintiff] be represented in this action by counsel."  *Id.* at *3.

Based on the assertions presented to the Court, it appears that Petty, an officer and majority stockholder of DFI, effectively owns DFI and controls its operations.  ECF 24 at 2.  Indeed, he claims that he had the authority to hire legal counsel to represent DFI in proceedings before the TTAB.  *Id.* at 3.  Further, he endeavored to secure counsel to represent Dib in this Court, although he has, to date, failed to do so.  *See* ECF 14; ECF 19.  In short, it is evident that Petty's connection with  Dib is "so intimate" that his "intervention, even though formally on his own behalf, is in effect an effort to enable [Dib] to appear without counsel, undermining the longstanding rule that a corporation may appear in federal court only through its lawyer."  *Jacobs*, 230 F.3d at 569.

Against this backdrop, it becomes apparent that, to the extent that Petty's lien provides him with a financial interest in the DIBCOIN mark, distinguishable from DFI's own, it is a distinction without a difference.  Rather, it seems that Petty, in effect, entered into a loan agreement with himself and, as a result, acquired a lien on what is, functionally, his own asset.  To allow his intervention in this context would open the door to future manipulation from corporate officers and shareholders, seeking to enable the appearance of a corporation in federal court without incurring the cost of hiring duly licensed counsel.

Therefore, I decline to permit Petty to intervene in this suit as a matter of right pursuant to Rule 24(a), or permissively under Rule 24(b), or to otherwise join the suit as a party in interest

under 15 U.S.C. § 1071(b)(4).  It follows that Petty's remaining motions must also be denied, without prejudice: the Motion to Dismiss, the S.J. Motion, and the Abatement Motion.[10]

### IV.  Default Judgment Motion

As mentioned, Luma asks the Clerk to enter default judgment against defendants pursuant to Fed. R. Civ. P. 55(b)(1).   ECF 27.  Rule 55(b)(1) rule provides that the Clerk must enter a default judgment if the plaintiff's claim is "for a sum certain or a sum that can be made certain by computation."  Fed. R. Civ. P. 55(b)(1).   Plaintiff suggests that relief under Rule 55(b)(1) is appropriate here because he has asked the Court to award him a "sum certain," in so much as he requested an award of the costs associated with effecting service on defendants.  ECF 27 at 1; *see* ECF 27-6.

But, plaintiff also seeks an Order vacating the decision of the TTAB and granting him further declaratory relief.  ECF 1 at 10-11.  Such remedies do not qualify as a sum certain, and thus the Clerk lacks the authority necessary to grant the Default Judgment Motion.  *See Nevada General Ins. Co. v. Anaya*, 326 F.R.D. 685, 690 (D.N.M. 2018) (explaining that because the "Court Clerk may enter a default judgment only [for a sum certain] the Court Clerk is not authorized . . . to enter a default judgment in a declaratory judgment action"); *W. World Ins. Co. v. Czech*, 275 F.R.D. 59, 62 (D. Mass. 2011) ("Because Western World seeks a declaratory judgment that it owes no duty to defend or indemnify Williams, plaintiff's claim is not for a 'sum certain' within the meaning of Fed. R. Civ. P. 55(b)(1) and thus the Clerk was not authorized to enter the Default Judgment"); *Northland Ins. Co. v. Cailu Title Corp.*, 204 F.R.D. 327, 329 (W.D. Mich. 2000) ("This is an action for declaratory relief; no sum certain has been requested.   Under the

---

[10] The Court would certainly entertain a renewed motion to dismiss for lack of personal jurisdiction, if such a motion were filed by a duly licensed attorney on behalf of the corporate defendants.

circumstances, Northland's request that the Clerk enter a default judgment in any form may not be granted.").

Notably, the United States Court of Appeals for the Fourth Circuit has a "strong policy favoring the disposition of cases on the merits . . . ." *Rangarajan v. Johns Hopkins Univ.*, 917 F.3d 218, 229 (4th Cir. 2019) (discussing *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993)), *cert. denied*, 139 S. Ct. 2762 (2019); *see Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 376 (4th Cir. 2013). However, the policy is not absolute. Rather, default judgment "'is appropriate when the adversary process has been halted because of an essentially unresponsive party.'" *Garnier-Thiebault, Inc. v. Castello 1935 Inc.*, SDT-17-3632, 2019 WL 6696694, at *1 (D. Md. Dec. 6, 2019) (Thacker, J.) (quoting *Int'l Painters & Allied Trades Indus. Pension Fund v. Cap. Restoration & Painting Co.*, 919 F. Supp. 2d 680, 684 (D. Md. 2013); *see SEC v. Lawbaugh*, 349 F. Supp. 2d 418, 421 (D. Md. 2005).

In any event, upon the entry of default against a party, the court must determine whether the undisputed factual allegations constitute a viable cause of action. *Ryan v. Homecomings Financial Network*, 253 F.3d 778, 780-81 (4th Cir. 2001); *see also* 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2688 (3d ed. 2010 Supp.) ("[L]iability is not deemed established simply because of the default . . . and the court, in its discretion, may require some proof of the facts that must be established in order to determine liability.").

Accordingly, to obtain a default judgment in this context, Luma must put forward facts that establish, as a matter of federal law, that he is entitled to ownership of the registered DIBCOIN mark. Relevant here, under 15 U.S.C. 1051(a), "only the owner of a mark is entitled to apply for registration." *In re Wella A.G.*, 787 F.2d 1549, 1554 (Fed. Cir. 1986) (emphasis omitted). Likewise, "only the owner of the mark is entitled to maintain an existing registration." *Id.* at 1554

n.1 (citations omitted)).  And, in order to determine the ownership of a mark, courts consider whether the applicant has the ability to "control[ ] the nature and quality of the goods sold under the mark . . . ."  *Id.* at 1554 (citing J. McCarthy, *Trademarks and Unfair Competition*, § 18.14, at 830 (2d ed. 1984)).

In this case, beyond Luma's bare assertions, he has not offered any evidence to the Court that tends to show that plaintiff owned the DIBCOIN mark on July 20, 2017, the date on which he filed his application with the TTAB.  To be sure, plaintiff appended several exhibits to the Default Judgment Motion.  But, these exhibits do not, in and of themselves, establish that Luma is entitled to the relief he seeks from the Court.

The exhibits include copies of emails that Luma exchanged with DFI officials reflecting the date on which he agreed to work for DFI and Sunshine, as well as the associated Compensation Agreement, executed on July 28, 2016 (ECF 27-1);[11] a portion of Luma's responses to DFI's requests for admission, presumably prepared in connection with proceedings before the TTAB (ECF 27-2); an overview of a computer network called "Coinprism" that Luma allegedly used to create DIBCOIN (ECF 27-3; *see* ECF 1, ¶¶ 13, 20-24; ECF 27 at 3); a copy of a certificate for 100,000 shares of Sunshine stock that was issued to plaintiff on July 18, 2016 (ECF 27-4); drafts of various business proposals involving DIBCOIN that Luma exchanged with DFI officials between July 8, 2016 and July 24, 2016 (ECF 27-5); and receipts reflecting the expenses that Luma incurred in effecting service on defendants (ECF 27-6).

Critically, these exhibits do not evidence the circumstances in which DIBCOIN was created and the roles of plaintiff or defendants in that process.  Moreover, the exhibits do not show

---

[11] The Compensation Agreement appears to include a typo that reflects that it was executed on April 28, 2016.  ECF 27-1 at 5.

that Luma had the capacity to "control[ ] the nature and quality of the goods sold under" the DIBCOIN mark at the time he applied to register it with the TTAB in July 2017. *In re Wella A.G.*, 787 F.2d at 1554.  Consequently, in my view, the proffered evidence is inadequate to justify awarding Luma a default judgment.

Even if I were satisfied that Luma had presented sufficient evidence to obtain a  default judgment, granting such a remedy at this juncture would be premature because it is apparent that Petty, for himself and/or Dib, has made clear his desire to oppose the suit, although he has yet to do so through a proper vehicle.  As the "President, CEO, and majority stockholder" of DFI (ECF 24 at 1), Petty is responsible for securing corporate counsel to represent DFI.  *See* ECF 14; ECF 19.  After Petty failed to do so, he moved to intervene in this suit in his personal capacity.  ECF 24.  Petty also filed two motions in opposition to the Default Judgment Motion.  *See* ECF 32; ECF 33.  But, it may be that he was awaiting a ruling on the motion to intervene before resorting to obtaining a lawyer for defendants.

As noted, Petty may not effectuate an "end run around" the rule requiring corporations to retain counsel to appear in federal court.  *Motionless Keyboard Co.*, 184 F. App'x at 968. However, until now, Petty did not know that the Court would not permit him to intervene to contest the Complaint on behalf of Dib or himself.

Accordingly, in light of Petty's pro se status and the Fourth Circuit's "strong policy that cases be decided on their merits," *Shaffer Equip. Co.*, 11 F.3d at 453, I am persuaded that defendants should be afforded one final opportunity to appear before the Court through proper representation and to respond to plaintiff's suit.  Thus, I shall deny the Default Judgment Motion, without prejudice.

## V.  Conclusion

For the aforementioned reasons, I shall deny the Intervention Motion (ECF 24); the Motion to Dismiss (ECF 25); the S.J. Motion (ECF 31); and the Abatement Motion (ECF 32).  And, I shall deny the Default Judgment Motion (ECF 27), without prejudice.

As a final note, this suit was initiated pursuant to 15 U.S.C. § 1071(b).  *See* ECF 1, ⁋ 3. When a complaint is filed under this provision, the Clerk of the Court is required to provide notice of the filing to the Director of the USPTO (the "Director"), who has the right to intervene in the suit.  *See* 15 U.S.C. § 1071(b)(2).  The docket does not reflect that such notice was provided.

Therefore, I shall order the Clerk to serve a copy of the Complaint, as well as a copy of the Docket sheet, this Memorandum, and the accompanying Order, on Drew Hirshfeld, the acting Director of the USPTO.

An Order follows.

Date: January 19, 2022                          _____/s/_____
                                                Ellen L. Hollander
                                                United States District Judge